

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00395-CR

———————————————————

DAKOTA ZACHARY WRIGHT, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1504386D

Before Birdwell, Womack, and Wallach, JJ.
Opinion by Justice Birdwell

**OPINION**

On July 3, 2017, Jose Angel Soria was sitting in his car outside his house in east Fort Worth when Appellant Dakota Zachary Wright approached him and drew a gun. Wright demanded Soria's wallet and phone, and Soria complied. For this, Wright was convicted of aggravated robbery and sentenced to fifty years' confinement. *See* Tex. Penal Code Ann. § 29.03(a)(2).

During trial, the State sought to introduce data that was extracted from Wright's phone, including text messages to loved ones in which Wright expressed his belief that law enforcement was closing in on him and photos that he took of himself and his firearms. On appeal, Wright challenges the admission of these text messages and photos.

As a means to that end, Wright contests the reliability of the expert testimony through which the State sponsored the messages and photos. Wright asserts that the State failed to establish the reliability of the technique that the State's expert, Detective Rex Kiser, used to extract the data from Wright's phone: forensic extraction using a computer program called Cellebrite. At trial, Detective Kiser explained that to extract the data, he simply connected the phone to his computer and initiated the Cellebrite program, which copied the data to the detective's memory stick and made it readable as text messages, call logs, images, etc. But Wright contends that pursuant to *Kelly v. State*, the State was required to establish the reliability of the scientific theories underlying Detective Kiser's extraction technique before the messages and photos

2

could be introduced. 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Wright contends that the State's reliability predicate for this extracted evidence was fatally inadequate, and the trial court therefore reversibly erred in admitting it.

As we explain, we disagree with Wright's central premise: for such a basic technique, the State was *not* required to establish a *Kelly*-style reliability predicate through expert testimony. It is therefore immaterial whether the State's effort to lay such a predicate was deficient. We overrule Wright's sole issue and affirm.

We review a trial court's decision to admit evidence for an abuse of discretion. *Colone v. State*, 573 S.W.3d 249, 263–64 (Tex. Crim. App. 2019). Under this standard, the trial court's decision to admit evidence will be upheld as long as it was within the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018). If the trial court's ruling on admissibility is correct under any theory of law, the trial court's decision should not be disturbed, even if the trial court gives the wrong reason for its ruling. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016).

An expert witness may offer an opinion if he is qualified to do so by his knowledge, skill, experience, training, or education and if scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing Tex. R. Evid. 702). "Witnesses who are not experts may testify about their opinions or inferences when those opinions or inferences are rationally based on the

perception of the witnesses and helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue." *Id.* (citing Tex. R. Evid. 701).

"[A]s a general rule, observations which do not require significant expertise to interpret and which are not based on a scientific theory can be admitted as lay opinions if the requirements of Rule 701 are met." *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002). "[E]ven events not normally encountered by most people in everyday life do not necessarily require the testimony of an expert." *Id.* "The personal experience and knowledge of a lay witness may establish that he or she is capable, without qualification as an expert, of expressing an opinion on a subject outside the realm of common knowledge." *Id.*; *see id.* at 536 (collecting cases).

"Because of its nature, scientific evidence will almost always be offered through the testimony of experts." *Everitt v. State*, 407 S.W.3d 259, 263 (Tex. Crim. App. 2013) (cleaned up) (quoting *Kelly*, 824 S.W.2d at 572). Under Rule 702, the proponent of scientific evidence must show by clear and convincing proof that the proffered evidence is sufficiently reliable and relevant to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Wells v. State*, 611 S.W.3d 396, 426 (Tex. Crim. App. 2020). We evaluate reliability under one of two tests, depending on whether it involves "hard" science or "soft" science. *Rhomer*, 569 S.W.3d at 671. "When an expert's testimony is based on a hard science involving precise calculations and the scientific method, the expert must satisfy the test set forth in *Kelly*, 824 S.W.2d at 573." *Rhomer*, 569 S.W.3d at 671. "The *Kelly* test for reliability of evidence derived from a

4

scientific theory requires that: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question." *Id.* To aid its determination of reliability under *Kelly*, the trial court may refer to seven non-exclusive factors: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of any expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and to evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of any person who applied the technique on the occasion in question. *Kelly*, 824 S.W.2d at 573.

For expert testimony in fields of study outside the hard sciences, i.e., soft science, we apply the framework set forth in *Nenno*. *Rhomer*, 569 S.W.3d at 671 (citing *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999)). Soft sciences consist of areas "involving technical or other specialized knowledge."[1] *Nenno*, 970 S.W.2d at 560. The *Nenno* test asks whether (1) the field of expertise is a legitimate one, (2) the subject

---

[1] Examples include "the social sciences of psychology, sociology, or criminology." *Stephenson v. State*, 226 S.W.3d 622, 625 n.2 (Tex. App.—Amarillo 2007, no pet.).

matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon and/or utilizes the principles involved in the field. *Id.* at 561.

One Texas court has held that the admissibility of expert testimony concerning information copied from a defendant's cell phone should be governed by the *Nenno* test for soft sciences because the exercise of copying the data "is more technical than scientific." *Rand v. State*, No. 14-16-00409-CR, 2017 WL 4273177, at *8 (Tex. App.—Houston [14th Dist.] Sept. 26, 2017, pet. ref'd) (mem. op., not designated for publication). Other courts have analyzed the reliability of data-extraction testimony using the *Kelly* test. *See Krause v. State*, 243 S.W.3d 95, 108–10 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Sanders v. State*, 191 S.W.3d 272, 277–78 (Tex. App.—Waco 2006, pet. ref'd); *Williford v. State*, 127 S.W.3d 309, 312–13 (Tex. App.—Eastland 2004, pet. ref'd).

In this case, the parties instead elected to litigate the reliability of the technique pursuant to the test applied in federal courts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591–94, 113 S. Ct. 2786, 2796–97 (1993). In *Daubert*, the Supreme Court enumerated four factors to aid trial judges in determining whether scientific evidence is reliable under federal Rule 702, and those factors overlap with the seven factors outlined in *Kelly*: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error; and (4) the general acceptance of

6

the theory or technique by the relevant scientific community. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 555 (Tex. 1995) (summarizing *Daubert*); *see Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997) (describing the *Daubert* standard as "virtually identical" to the *Kelly* standard).

At the hearing to determine the admissibility of the data that Detective Kiser extracted from Wright's cell phone, Wright took Detective Kiser on voir dire and asked him questions concerning *Daubert*'s factors for reliability. To these questions, Detective Kiser gave minimal answers: Wright asked whether his technique had been tested ("Yes, sir."), whether it had been subject to peer review and publication ("Peer review, yes. Publication, I'm not sure."), whether there were standards controlling its operation ("Yes, sir."), whether there was a potential rate of error ("I would not have those numbers."), and whether it was accepted in the relevant community ("Yes, sir, it has."). When Wright concluded his voir dire, the State did not put on any further evidence to address the *Kelly* factors or to otherwise shore up this testimony.

On appeal, Wright contends that the State failed to establish the reliability of the scientific principles underlying Detective Kiser's technique under the first prong of *Kelly*.

If *Kelly* governed, then there could be some merit to this contention, because there is no evidence pertaining to the *Kelly* factors beyond Detective Kiser's bare conclusions. "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."

*Coble v. State*, 330 S.W.3d 253, 277 n.62 (Tex. Crim. App. 2010) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)).

We need not decide whether the State laid an adequate reliability predicate under *Kelly*, though, because we are convinced that *Kelly* does not govern here. Neither do *Nenno* or *Daubert*.

Rather, this court's reasoning in *Washington v. State* suggests that Detective Kiser's evidence qualifies as lay testimony of the sort that does not require a reliability predicate at all. *See* No. 02-13-00526-CR, 2015 WL 505172, at *2–5 (Tex. App.—Fort Worth Feb. 5, 2015, pet. ref'd) (mem. op., not designated for publication). In *Washington*, a detective used "UFED Cellebrite" to extract data from a cell phone and copy it to another location. *Id.* at *2. The detective explained that the process was simple: he connected a cable to the phone, selected the model of phone in the software, and initiated the process. *Id.* He further explained that he knew the process was successful because the program confirmed it and because the program copied a report of the extracted data onto a memory stick. *Id.* The detective admitted that he did not know the "technological details" of how the program worked, whether the program had been tested for accuracy, or even what the letters "UFED" stood for. *Id.* Nonetheless, the trial court admitted the exhibit over a reliability objection because there were other

8

witnesses to corroborate that the extracted text messages truly and accurately represented the content of their text exchanges with the defendant. *Id.* at *3.

On appeal, we affirmed the trial court's ruling. *Id.* at *4. We reasoned that unlike other technologies, a simple data transfer was "amenable to precise independent corroboration or confirmation by untrained lay witnesses [and] proper application by an untrained judge or jury without supporting expert testimony." *Id.* And because the witnesses' corroboration "empirically showed that the extractions accurately copied and displayed text-message exchanges," we held that no expert testimony was required to demonstrate whatever reliability was necessary. *Id.*

Of course, this reasoning effectively skipped the reliability inquiry altogether, especially the prong that Wright challenges here: whether the underlying scientific theory is valid. We did not give a second thought to whether the principles of electrodynamics and computer science were worthy of credence. *See Morris v. State*, 361 S.W.3d 649, 655 n.28 (Tex. Crim. App. 2011) (citing *Hernandez v. State*, 116 S.W.3d 26, 34–35, 37 (Tex. Crim. App. 2003) (Keller, P.J., concurring)) (acknowledging that "matters of common knowledge can be recognized without a prior determination of reliability").

Our holding suggests that no *Kelly*-style reliability predicate is required for this specific process. One purpose served by the reliability requirement is to ensure that complex or unfamiliar systems and ideas—those that "require significant expertise to interpret" or that are "based on scientific theory"—do not lead the lay fact-finder astray.

9

*See Osbourn*, 92 S.W.3d at 537. Rather than advancing those aims, the drift of our reasoning in *Washington* was nearly the opposite: that this sort of data-transfer evidence was so simple and familiar to any computer user, so plainly verifiable and free of scientific variability, that a lay witness's corroboration of the results based on personal knowledge would sufficiently guard against misleading the fact-finder, even without an expert or a reliability predicate. And a lay witness's corroboration that a process yielded accurate results usually serves the goal of *authentication*, not reliability; Rule 901 provides that evidence about a process or system may be authenticated by "describing a process or system and showing that it produces an accurate result." *See* Tex. R. Evid. 901(b)(9). Thus, our opinion in *Washington* suggests that so long as the data extracted from the cellphone is properly authenticated by lay testimony, no reliability predicate or expert testimony is required.

In this case, Detective Kiser offered that lay authentication. He employed the same software as in *Washington*, Cellebrite. He explained that the extraction process consisted entirely of plugging a cable into the phone and starting the extraction program on his computer. *See Rand*, 2017 WL 4273177, at *8 (emphasizing the "simplicity" of data extraction). His testimony before the jury rested almost solely on his personal experience. To the extent that his testimony featured any opinions at all, they were based upon his perceptions and his training in using the software, not on anything that would require significant expertise or scientific acumen. *See Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010) (holding that a detective did not cross into the territory

of experts because the detective "testified based upon his first-hand observation of the wounds themselves. His observations did not require significant expertise to interpret and were not based on scientific theory."). No "specialized knowledge" was required to see that the extraction produced intact photos of Wright and text messages addressed to Wright's loved ones (as opposed to the corrupted files, error messages, and unreadable mess that would have likely resulted from a failed or tainted transfer).[2] *See Osbourn*, 92 S.W.3d at 537. And Detective Kiser properly authenticated all the text messages and photos that the State presented. Thus, we believe that this case calls for a similar result as *Washington*: it is enough that the extracted data was authenticated by lay testimony, even without a reliability predicate properly laid by an expert.[3]

Our conclusion finds support in several analogous federal cases.[4] In *United States v. Marsh*, the Second Circuit held that a federal agent's testimony concerning Cellebrite data extraction did not cross the line into expert testimony, for which a reliability

---

[2]Wright was free to put on evidence that the transfer or the resulting data were in fact tainted, manipulated, or fabricated.

[3]*See Harrell v. State*, No. 10-16-00342-CR, 2019 WL 2385682, at *5–6 (Tex. App.—Waco June 5, 2019, no pet.) (mem. op., not designated for publication) (assuming that the State failed to properly qualify its witness as an expert, but nonetheless upholding the ruling because the same testimony could be brought in as lay opinion testimony).

[4]*Cf. Somers v. State*, 368 S.W.3d 528, 536–37 (Tex. Crim. App. 2012) ("When evaluating a trial judge's gatekeeping decision, appellate courts may take judicial notice of other appellate opinions concerning a specific . . . technique."); *Morris*, 361 S.W.3d at 659 (relying on federal decisions to reaffirm a conclusion concerning reliability).

predicate would be required, because the agent "did not purport to render an opinion based on the application of specialized knowledge to a particular set of facts; nor did his testimony turn on or require a technical understanding of the programming or internal mechanics of the technology." 568 F. App'x 15, 17 (2d Cir. 2014) (order). Just as we did in *Washington*, the Second Circuit emphasized that the agent simply "described how he used Cellebrite to" extract the data and "confirmed the results by checking the messages on the phone." *Id.* Applying similar thinking, the Ninth Circuit excused a detective's testimony concerning Cellebrite data extraction from Rule 702's expert-testimony requirements. *United States v. McLeod*, 755 F. App'x 670, 673 (9th Cir.) (mem. op. on reh'g), *cert. denied*, 139 S. Ct. 1641 (2019); *see United States v. Seugasala*, 702 F. App'x 572, 575 (9th Cir. 2017) (mem. op.) ("The officers who followed the software prompts from Cellebrite . . . to obtain data from electronic devices did not present testimony that was based on technical or specialized knowledge that would require expert testimony."). In the First Circuit's treatment of the same issue, the court concluded that an officer's testimony concerning cellphone data extraction better resembled a lay opinion than an expert one, and thus the court was not required to "vet the opinion to ensure it's 'reliable'":

> These days, most anyone with a cellphone knows they store information about text messages, including the sender, recipient, and content. You don't need to be a software engineer to pick up a cellphone, open a messaging application, and interpret the words in the bubbles as messages sent and received. In doing so, ordinary people rely on a "process of reasoning familiar in everyday life," not any expert knowledge about software coding or cellphone circuitry. If Officer Pérez had opened

12

Montijo's phone and taken screenshots of his conversations with Meléndez, no one suggests she'd need any "scientific, technical, or specialized knowledge" to identify them as text messages.

*United States v. Montijo-Maysonet*, 974 F.3d 34, 47 (1st Cir. 2020). Likewise, according to the Fourth Circuit, a Department of Homeland Security intern did not render an expert opinion, such that a reliability predicate would be required, because "[a]t most, he offered the opinion that Cellebrite copies data from a cellphone, which he derived from his personal experience using the software." *United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir. 2019). The Fourth Circuit relied on another court's "analogy that expert testimony is necessary to describe specialized medical tests but not to describe reading a thermometer"; the DHS intern's "testimony that he copied information from a phone to a hard drive is, in our view, closer to the latter." *Id.* at 435 (citing *United States v. Ganier*, 468 F.3d 920, 926 (6th Cir. 2006)); *accord Montijo-Maysonet*, 974 F.3d at 48.

We agree with these courts that copying data using Cellebrite is like the common exercise of using a thermometer,[5] though it is perhaps even more like bagging up evidence at a crime scene. To be sure, a given expert might offer sophisticated insights into the process of bagging evidence, with topics ranging from the physics through which the plastic bag keeps the evidence inside, to the anatomy of the officer doing the bagging, or to the chemistry of the fluid in the marker that the officer uses to write his initials on the bag. But ordinarily, we do not require expert testimony to establish the

---

[5]Or, as the State argued in one Texas case, like a "photocopier for computers." *Williford*, 127 S.W.3d at 312.

13

reliability of these aspects of the process before there may be simple testimony that an officer took evidence, preserved it in a bag, and initialed it for authentication purposes.

In the same way, Detective Kiser effectively used a digital tool to "bag up" digital evidence. While we are confident that the right experts could shed light on the many complex dimensions involved in that process, we do not believe that an expert was required to demonstrate the reliability of each of those dimensions before Detective Kiser could testify that he simply copied data from one location to another. It is enough that Detective Kiser authenticated the photos and text messages that were obtained through the extraction, even without a proper *Kelly* predicate.[6]

We therefore overrule Wright's sole issue, in which he contends that the trial court reversibly erred by admitting the text messages and photos without an adequate predicate under *Kelly*. We affirm the trial court's judgment.

/s/ Wade Birdwell
Wade Birdwell
Justice

---

[6]Even assuming that a reliability predicate was generally required for this type of evidence, we believe that the reliability of the scientific theory underlying Cellebrite has been adequately established by the previous cases that have assessed this sort of technology. *See Rand*, 2017 WL 4273177, at \*8; *Krause*, 243 S.W.3d at 108–10; *Sanders*, 191 S.W.3d at 277–78; *Williford*, 127 S.W.3d at 312–13. "[C]ourts do not necessarily have to relitigate what is valid science in every case: 'It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown "gatekeeping" hearings under *Kelly*.'" *Morris*, 361 S.W.3d at 655 (quoting *Hernandez*, 116 S.W.3d at 29). "Trial courts are not required to re-invent the scientific wheel in every trial." *Id.* (quoting *Hernandez*, 116 S.W.3d at 29). "[C]ourts can take judicial notice of the reliability (or unreliability) of the type of evidence at issue." *Id.* Thus, to the extent that *Kelly* applies, we take judicial notice of the cases holding that this type of technology satisfies *Kelly*'s mandate for reliable scientific underpinnings.

14

Publish

Delivered:  February 4, 2021